UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROSALBA VARGAS-ORTIZ,<br><br>                    Plaintiff,<br><br>v.<br><br>John MCCARTHY, Boise Field Office Director of United States Citizenship and Immigration Services; KRISTI BARROWS, District Director of the United States Citizenship and Immigration Services; UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES,<br><br>                    Defendants. | Case No. 1:14-cv-00393-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

**INTRODUCTION**

Plaintiff Rosalba Vargas-Ortiz is an immigrant from Mexico who arrived in the United States in 1983 at the age of eighteen. Vargas contends she was accorded temporary resident status, and that she lawfully renewed her status and became a lawful permanent resident, pursuant to the Special Agricultural Work (SAW) program.

Vargas filed this action on September 17, 2014, seeking declaratory and mandamus relief requiring Defendants to issue her a replacement lawful permanent

**MEMORANDUM DECISION AND ORDER - 1**

resident card under 8 U.S.C. § 1304(d). Defendants (collectively referred to as the Government) are the heads of the various agencies responsible for processing Vargas's I-90 application. The Government contends it has no record of Vargas's application for temporary resident status, and that Vargas has been residing in the United States unlawfully for over 25 years because, absent an initial application, Vargas never attained temporary resident status.

The parties filed cross motions for summary judgment; the Court conducted a hearing on January 12, 2016, taking the motions under advisement at that time. On January 22, 2016, Vargas filed leave to submit supplemental authority, which request the Court granted; the Court allowed the Government to respond. The Government filed an objection to the Court's consideration of a Homeland Security Memorandum attached to the motion (Dkt. 57-1), and requested the Court strike a portion of page three because the motion exceeds the word limit under Fed. R. App. P. 28(j). Vargas submitted a reply.

The matter is now fully briefed and ripe for the Court's consideration.[1] Having considered the record, the pleadings, relevant authority, and being fully advised, the Court will grant Vargas's motion and deny the Government's motion.

---

[1] The parties consented to the jurisdiction of the undersigned Magistrate Judge to conduct all proceedings and enter judgment in this case pursuant to 28 U.S.C. § 636(c).

**MEMORANDUM DECISION AND ORDER - 2**

## FACTS

The following facts are taken from the certified administrative record filed under seal on August 28, 2015, and supplemented on September 28, 2015. (Dkt. 38, 43.)

Rosalba Vargas Ambriz, now Rosalba Vargas-Ortiz, was born on February 16, 1965, in Coneneo, Michoacan, Mexico. Vargas entered the United States on April 13, 1983, at the age of eighteen, on foot via Tijuana. Vargas sought employment and worked sorting fruit for Suma, in Sanger, a small town near Fresno, California.

Vargas states that, "in 1985 or 1986," she was given some papers by the contractor who obtained the fruit picking job for her. The papers consisted of a yellow form with two pages that she filled out and submitted to obtain a temporary resident card. Vargas contends she was residing in Sanger, California, at the time, and the paperwork was processed at the immigration office in Fresno, California. Vargas states she received her temporary resident card in person, at the Fresno immigration office.

Vargas was issued a Temporary Resident Card on June 3, 1988, under Alien Number A090-422-457, bearing the name "Maria Rosalva Vargas," a date of birth of February 3, 1965, and an expiration date of June 3, 1992. (Dkt. 38-1 at 48.) The card displays Vargas's photograph and fingerprint. Vargas signed the card, "Mᵃ Rosalba." Vargas contends she informed immigration officials that the card contained an incorrect name and date of birth, but she was assured there was no problem because she had a valid Alien Number. The Government does not dispute that the photograph and fingerprint are Vargas's, and that the card is authentic.

Vargas later moved to Idaho. Before the card was set to expire on June 3, 1992, Vargas visited the immigration office in Boise to renew her card. She filled out Form I-90, Application to Replace Alien Registration Card, and she received a "Customer's receipt" in the amount of $70.00. The customer receipt stated the payment was from "Rosalba Vargas." Vargas indicates she wrote her name correctly on Form I-90, and she wrote her correct date of birth.[2]

Official Receipt Number LIN-92-217-51191, dated July 30, 1992, indicates an amount received of $70.00, and acknowledges receipt of Vargas' I-90 application. The receipt bore the name, "Maria G. Bueno de Vargas," and it was mailed to Vargas's post office box address in Grand View, Idaho. (Dkt. 38-1 at 59.) The receipt notice indicated it would take 30 – 60 days to process Vargas's application, and Vargas would receive written notification once a decision was made.

Vargas later received a Lawful Permanent Resident Card.[3] The LPR Card issued by the Government had the name "Bueno de Vargas, Maria Guadalup," under Alien Number A-090-422-457, and had an expiration date of February 3, 2003. The card bore Vargas's photograph and fingerprint, but the same incorrect date of birth of February 3, 1965, as on her Temporary Resident Card. The card indicated a "temporary resident adjustment date" of June 3, 1987. Vargas contends she received the Permanent Resident Card in person at the immigration office in Boise. She contends she pointed out the

---

[2] Vargas later married Martin Ortiz in Glenns Ferry, Idaho on September 2, 1992. (Dkt. 38 at 49.)

[3] It is not clear from the record when Vargas received her LPR Card.

**MEMORANDUM DECISION AND ORDER - 4**

incorrect information, and asked the immigration office to fix the errors in her name and birthdate, but was told there was no problem because the alien number was hers and the fingerprint on the card was hers. Vargas signed the card, "M[a] Rosalba Vargas" on the front, and "Rosalba Vargas" on the back. She used the name Maria because the card had Maria on it, and she thought her signature had to "match up."

When Vargas was unable to obtain unemployment benefits in 2002 because of the name and date of birth errors on her card, Vargas visited the Boise immigration office to inquire again about the errors on her card. At that time, the Boise immigration office took Vargas's card and issued her a temporary card extending her existing card for 90 days.[4] Vargas was informed that an investigation would ensue, and she would have a new card in three to six months. Her photograph and fingerprints were taken again at that time. The temporary card was issued on or about December 2, 2000, to "Maria Vargas," date of birth February 3, 1965, under the same Alien Number A-090-422-457, and it bore a Glenns Ferry, Idaho address. (Dkt. 38-2 at 47.)

On December 5, 2007, Vargas's attorney prepared an I-90 Application to Replace Permanent Resident Card on behalf of Vargas on the grounds her card was issued with incorrect information because of USCIS administrative error. The application was submitted on May 20, 2008, to the Nebraska Service Center. Vargas used Alien Number

---

[4] It appears from the record that Vargas's card was taken on December 2, 2000, and extended for 90 days thereafter. (Dkt. 38-2 at 47-48.) It appears also that a set of fingerprints, and Vargas's photograph, were taken on December 4, 2000, and that an investigation ensued regarding Vargas's identity in 2000-2001. (Dkt. 38-2 at 49, 53, 58.) During her interview, Vargas may have been mistaken regarding the year she visited the immigration office in Boise.

**MEMORANDUM DECISION AND ORDER - 5**

A090-422-457, and was issued Receipt Number LIN08-16951481. On December 23,

2008, the Director of the Nebraska Service Center of USCIS requested additional

evidence, on the grounds that the documentation submitted was not sufficient to warrant

favorable consideration of Vargas's 2008 I-90 Application. On March 10, 2009, the

Nebraska Service Center requested an interview of Vargas, because it was discovered

that Alien Number A090-422-457 belonged to a naturalized citizen, Maria Guadalupe de

Vargas, who was born in Cuba, and then living in Miami, Florida.[5]

On September 10, 2009, Vargas was interviewed as part of the investigation.

Vargas confirmed she never had a card (I-551) displaying her correct name and date of

birth. Vargas admitted to using the name Maria and Vargas, but not "Bueno de Vargas,"

to apply for her social security card, because that was what her Temporary Resident Card

reflected. During the interview, Vargas was informed the Alien Number she had been

using belonged to a naturalized citizen in Florida by the name of Maria Guadalupe Bueno

de Vargas, with a date of birth of February 3, 1965, who naturalized in 1995. Vargas

denied ever having lived in Florida, or having provided false information to USCIS to

obtain an immigration benefit.

On October 19, 2009, USCIS issued its notice of decision regarding Vargas's 2008

I-90 Application. The decision denied Vargas's application on the grounds that a search

---

[5] According to the Administrative Record, two individuals were assigned the same Alien Number. The WEB-ISRS Multi Selected Detail Information contains two cards, bearing Alien Number A090-422-457, with the name "Maria Guadalup Bueno de Vargas," birthdate February 3, 1965. One card has the Florida citizen's photograph and fingerprint, while the other card contains Vargas's photograph and fingerprint. Vargas's card is signed, "Mᵃ Rosalba Vargas." (Dkt. 38-2 at 26.) According to Angela Barrows, a review of USCIS systems records in 2001 confirmed there were two individuals claiming the same Alien number but with distinct photographs and fingerprints.

of USCIS records "show[s] that you are not a Permanent Resident of the United States.
Applicant has never been in LPR[6] status. Applicant has been receiving incorrect LPR
cards ever since applying for Temporary Resident status in the mid 1980's." Because
there was no evidence of Vargas's permanent resident status, USCIS determined Vargas
was ineligible to receive a replacement Permanent Resident Card. Accordingly, the I-90
Application was denied.

As a result of the October 2009 proceedings, Vargas was issued a new Alien
Number, A089-926-962, identifying her with her correct name and date of birth.[7]  A
Record of Deportable/Inadmissible Alien prepared by an immigration service officer on
October 19, 2009, indicates "Immigration Services feels she did not fraudulently obtain
LPR status. Subject is removable under 212(a)(7)(A)(i)(I) of the Immigration and
Nationality Act." (Dkt. 38-2 at 14.)[8]

Vargas was then subjected to removal proceedings. A Notice to Appear was issued
on October 19, 2009, charging Vargas under Section 212 of the Immigration and
Nationality Act as inadmissible because she was an immigrant not in possession of a

---

[6] LPR is shorthand for Lawful Permanent Resident.

[7] A later Statement of Findings dated August 26, 2013, indicates Vargas's temporary resident
card with expiration date June 3, 1992, and Resident Alien Card with expiration date February 3, 2003,
"were procured either by fraud or Service error. In 2009, VARGAS's I90 was denied for no benefit due,
and not fraud, as a matter of discretion. At that time she was placed into proceedings to help her resolve
her immigration issues." (Dkt. 38-2 at 10.)

[8] A prior Fraud Verification Memorandum prepared on September 14, 2009, indicated Vargas
had been using the identity of Maria Guadalupe Bueno de Vargas, date of birth February 3, 1965, a
naturalized citizen who currently resides in Miami, Florida, but that there was no evidence to indicate the
identity fraud was malicious.

**MEMORANDUM DECISION AND ORDER - 7**

valid unexpired visa, permit, or other valid entry document. However, the Government filed a motion to dismiss the proceedings on October 18, 2010, on the grounds that the Notice to Appear was "improvidently issued," and indicated the Government no longer wished to pursue the charges. On November 8, 2010, the Immigration Court issued its order terminating the removal proceedings.

On March 5, 2013, Vargas's counsel again submitted a Form I-90 application on behalf of Vargas, under her initial Alien Number A090-422-457.[9] Vargas contended her existing card had incorrect data because of USCIS error. On September 13, 2013, the application was denied. The written decision, dated September 24, 2013, indicates the basis for the denial was that "[a] review of your record shows that you are not, nor have you ever been, a Permanent Resident of the United States," and therefore USCIS determined Vargas was ineligible to receive a replacement permanent resident card. Further, the decision indicates Vargas applied using another individual's Alien Number. According to USCIS, there was no record of any legal immigration status matching Vargas's name, birthdate, and fingerprints. The decision indicates also that Alien Number A089-926-962 was the only Alien number that could correctly identify Vargas at USCIS, and she was warned to cease using Alien Number A090-422-457.

---

[9] An initial Statement of Findings issued by USCIS, dated August 26, 2013, recounted the history of the 2008 I-90 application, the September 10, 2009 interview, and the removal proceedings. Importantly, the Findings state, "On November 8, 2010, OCC erred in filing a motion to dismiss stating that the charges could not be sustained because the applicant was not ACTIVELY ENGAGED IN FRAUD. Proceedings were terminated." The same Findings indicate the March 7, 2013 Form I-90 was "made in conspiracy with her attorney … to knowingly commit identity theft by using an alien number known to belong to BUENO DE VARGAS."

**MEMORANDUM DECISION AND ORDER - 8**

Vargas filed a motion to reconsider, which was denied on December 17, 2013. The decision indicates the grounds were, again, that the USCIS issued the card to Vargas in error, and it belonged to someone else. Because USCIS found Vargas never obtained lawful permanent residence in the United States, USCIS was not able to rescind her lawful permanent residence status because Vargas never had it. This action followed.

Also in the record are portions of Maria Guadalupe Bueno de Vargas's file, and the Declaration of Angela Barrows referencing other documents in Maria's file which are not part of the administrative record. (Dkt. 38-3, Dkt. 48-2.) According to the Government, Maria Guadalupe Bueno de Vargas submitted a Form I-700, Application for Temporary Resident Status as a Special Agricultural Worker, on June 3, 1987, and Alien File No. A090-422-457 was created.[10] The Form I-700 was recommended for approval and the application was granted on April 4, 1988. The Immigration and Naturalization Service issued a Form I-688, record of temporary resident status, to Maria Guadalupe Bueno-Vargas, A090-422-457, which would expire on December 1, 1990.[11]

On February 14, 1990, Maria filed a Form I-90, Application to Replace Permanent Resident Card, under A090-422-457, indicating she was applying for I-551 permanent residence under Group I-SAW. (Dkt. 38-3 at 11.) Based upon Form I-90, INS issued

---

[10] Coincidentally, Maria submitted her I-700 Application exactly one year prior to the date Vargas was issued her Temporary Resident Card on June 3, 1988. SAW applications were accepted beginning June 1, 1987. 8 U.S.C. § 1160(a)(1)(A).

[11] Maria's temporary card was set to expire in 1990, while Vargas's temporary card was set to expire in 1992. At the hearing, the government explained that the dates coincided with the different groups admitted under the SAW program, and that Maria was in Group I-SAW while Vargas was in Group 2-SAW, which would explain why Vargas's adjustment of status date was later than Maria's adjustment of status date.

**MEMORANDUM DECISION AND ORDER - 9**

Maria a Resident Alien Card. Maria's Resident Alien Card indicates an expiration date of August 6, 2000, and is signed "Maria G. Vargas." (Dkt. 38-3 at 9.) In all other respects, Maria's Resident Alien Card is identical to Vargas's Lawful Permanent Resident Card issued to Vargas on or about July 30, 1992, other than it bears Maria's photograph and fingerprint. (Compare Dkt. 38-1 at 43 with Dkt. 38-3 at 9.) The reverse side of Maria's card reflects a temporary resident adjudication date of June 3, 1987; an S16 code of admission, signifying admission under the SAW program; and the code MIA, signifying that the applicant's adjudication of temporary residence was in the Miami immigration office. (Dkt. 38-3 at 9.)

Interestingly, Vargas's 1992 card indicates the same Temporary Adjustment Date of June 3, 1987, an S16 code, and "MIA." (Dkt. 38-1 at 43.) The Government does not explain why these same codes appear on Vargas's 1992 card, or why an immigration official did not question the MIA designation on Vargas's Lawful Permanent Resident Card when Vargas submitted her I-90 Application to Replace Alien Registration Card on or about July 30, 1992, at the Boise immigration office.

On March 9, 1995, Maria filed Form N-400, application for Naturalization, which was approved on June 24, 1995. Maria Guadalupe Bueno de Vargas became a naturalized citizen on December 14, 1995. USCIS contacted Maria on September 11, 2015, in Arcadia, Florida, and confirmed she had always lived in Arcadia, Florida, since arriving in the United States.

According to the Government, it has no record of a Form I-700 submitted in the name of Rosalba Vargas Ambriz. Further, the Government contends the SAW program

did not accept applications until June 1, 1987, and that the Form I-700, Application for

Temporary Resident Status as a Special Agricultural Worker, was a three page, white

form with a green stripe down the left side of the first page, not a two page yellow form

as described by Vargas. All records pertaining to Vargas previously contained in A-File

A090-422-457 were placed in Vargas's new A-File, A089-926-962, sometime in October

of 2009.

## DISCUSSION

### 1.    Summary Judgment Standard

Summary judgment is appropriate where a party can show that, as to any claim or

defense, "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the

summary judgment "is to isolate and dispose of factually unsupported claims." *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). It is "not a disfavored procedural

shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or

defenses [can] be isolated and prevented from going to trial with the attendant

unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere

existence of some alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 247–48 (1986). There must be a genuine dispute as to any material fact—a fact

"that may affect the outcome of the case." *Id*. at 248. The Court must be "guided by the

substantive evidentiary standards that apply to the case." *Id*. at 255.

When cross-motions for summary judgment are filed, the Court must independently search the record for factual disputes. *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). The filing of cross-motions for summary judgment—where both parties essentially assert there are no material factual disputes—does not vitiate the court's responsibility to determine whether disputes as to material facts are present. *Id*.

2.      **The APA and the Mandamus Act**

Mandamus is an extraordinary remedy "available to compel a federal official to perform a duty only if: (1) the individual's claim is clear and certain; (2) the official's duty is nondiscretionary, ministerial, and so plainly prescribed as to be free from doubt, and (3) no other adequate remedy is available." *Patel v. Reno*, 134 F.3d 929, 931 (9th Cir. 1997); 28 U.S.C. § 1361 ("the district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.").

Alternatively, under the APA, petitioners may seek review of final agency action under 5 U.S.C. § 704. *See also* 5 U.S.C. § 702 (providing a right of review for a person suffering a legal wrong because of agency action, or because the individual was adversely affected or aggrieved by agency action). Summary judgment serves as an avenue for deciding whether a final agency determination is adequately supported by the administrative record when there is no genuine issue of material fact. *Nw. Motorcycle Ass'n v. U.S. Dep't Agric*., 18 F.3d 1468, 1471–72 (9th Cir. 1994). In deciding whether to grant summary judgment in an APA challenge, the district court "is not required to

resolve any facts in a review of an administrative proceeding." *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985). The purpose of the district court "is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Id.*

The scope of judicial review is set forth in 5 U.S.C. § 706, which provides, in pertinent part:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
> > (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> > ***
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706. The APA further directs that "each agency shall proceed to conclude a matter presented to it" "within a reasonable time." 5 U.S.C. § 555(b). However, 5 U.S.C. § 706(1) only empowers a court to compel an agency "to perform a ministerial or non-discretionary act," or "to take action upon a matter, without directing how it shall act." *Norton v. So. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004).

Agency action is arbitrary and capricious if:

> The agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to

**MEMORANDUM DECISION AND ORDER - 13**

the evidence before the agency, or is so implausible that it could not
be ascribed to a difference in view or the product of agency
expertise.

*City of Sausalito v. O'Neill*, 386 F.3d 1186, 1206 (9th Cir. 2004) (quoting *Motor Vehicle*

*Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983)). The

standard is "highly deferential, presuming agency action to be valid and affirming the

agency action if a reasonable basis exists for its decision." *Nw. Ecosystem Alliance v.*

*U.S. Fish and Wildlife Serv*., 475 F.3d 1136, 1140 (9th Cir. 2007) (quoting *Indep.*

*Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000)). A court must be

"searching and careful" in its review of an agency action, but is not to substitute its

judgment for that of the agency. *Friends of Clearwater v. Dombeck*, 222 F.3d 552, 556

(9th Cir. 2000) (citing *Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1571 (9th Cir.

1993)). In other words, there must be a "clear error of judgment." *League of Wilderness*

*Defenders v. U.S. Forest Serv.*, 549 F.3d 1211, 1214 (9th Cir. 2008).

The Court's review is based on the administrative record that was before the

agency decision makers at the time they made their decision. *Repaka v. Beers*, 993

F.Supp.2d 1214, 1218 (S. D. Cal. 2014) (citing *Citizens to Preserve Overton Park v.*

*Volpe*, 401 U.S. 402, 420 (1971)); *see also Nw. Ecosystem Alliance*, 475 F.3d at 1140

(noting the court is not to consider information outside of the administrative record and

may not substitute its judgment for that of the agency). The agency must examine the

relevant data and articulate a satisfactory explanation for its action, including a "rational

connection between the facts found and the choice made." *Motor Vehicle*, 463 U.S. at 43.

For an agency decision to be upheld under the arbitrary and capricious standard, the

**MEMORANDUM DECISION AND ORDER - 14**

Court must find that evidence in front of the agency provided a rational and ample basis for its decision. *Nw. Motorcycle Ass'n*., 18 F.3d at 1471. The plaintiff bears the burden of showing that agency action was arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with the law. *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976).

Initially, the parties disagree on whether the arbitrary and capricious standard applies. The Government contends it does, while Vargas argues the less deferential "reasonableness" standard applies.[12] In *Alaska Wilderness Recreation and Tourism Ass'n. v. Morrison*, 67 F.3d 723 (9th Cir. 1995), the United States Court of Appeals for the Ninth Circuit recognized a distinction between predominantly legal versus factual disputes. In cases involving resolution of factual disputes, the arbitrary and capricious standard of review applies, while disputes involving predominantly legal questions require a reasonableness standard of review. 67 F.3d at 727.

The parties did not explain in great depth why this matter presents a legal versus a factual dispute. The Court notes, however, that *Alaska Wilderness* and its progeny involve matters falling under the National Environmental Policy Act. *See Marsh v. Or. Natural Resources Council*, 490 U.S. 360, 375-76 (1989) (recognizing the different standards of review in a NEPA matter, and applying the arbitrary and capricious standard).[13] Accordingly, the Court questions whether *Marsh* and *Alaska Wilderness*

---

[12] Nonetheless, Vargas argues the Government acted arbitrarily and capriciously, which necessarily assumes the Government acted unreasonably as well. Pl.'s Mem. at 17. (Dkt. 47-1 at 17.)

[13] *Marsh* appears to be the first decision recognizing the legal versus factual distinction.

**MEMORANDUM DECISION AND ORDER - 15**

apply when the action does not involve NEPA, as *Marsh* appears to limit the dual

standard of review to NEPA actions.

Vargas cites *Price Rd. Neighborhood Assoc., Inc. v. U.S. Dept. of Transportation*,

113 F.3d 1505, 1508 (9th Cir. 1997), another matter involving NEPA, wherein the Court

appeared to explicitly limit the dual standard of review to NEPA actions. There, the court

stated:

> Two standards govern our review of an agency's NEPA actions. We
> review factual disputes, which implicate substantial agency
> expertise, under the arbitrary and capricious standard. Marsh v.
> Oregon Natural Resources Council, 490 U.S. 360, 376-77, 109 S.Ct.
> 1851, 1859-61, 104 L.Ed.2d 377 (1989); Greenpeace Action v.
> Franklin, 14 F.3d 1324, 1330-31 (9th Cir.1992). We review legal
> disputes under the reasonableness standard. *Alaska Wilderness
> Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 727 (9th
> Cir.1995).

*Price Rd.*, 113 F.3d at 1508.

Nonetheless, upon review, the agency action here does not raise predominantly

legal questions, such as the interpretation of a statute. Rather, the Court is reviewing the

USCIS's final administrative decision issued September 24, 2013, denying Vargas'

second I-90 Application to Replace Permanent Resident Card. The arbitrary and

capricious standard of review applies here.[14]

---

[14] Further, Vargas does not press the issue, because she argues the Government acted arbitrarily and capriciously. Because the Court finds the dispute concerning the standard of review is not pivotal, and that Vargas did not squarely present the issue as such, the Court declines to decide whether, in an immigration matter, the Court must choose between two standards of review before examining USCIS's actions. Nor does the Court extend the holding in *Price* by concluding here that USCIS's actions do not involve legal questions.

### 3.     Application of the Arbitrary and Capricious Standard Under the APA

**A.     *Evidentiary Issues***

First, the Court addresses whether the Declaration of Angela Barrows may be considered. Vargas objects to the introduction of the Barrows Declaration, arguing the declaration and exhibits should be stricken from the record. The Government argues the Barrows Declaration should be considered because it explains the agency's action.

When reviewing agency decisions, the Court is limited to reviewing the closed administrative record, with few exceptions. C*tr. for Biological Diversity v. U.S. Fish & Wildlife Serv*., 450 F.3d 930, 943 (9th Cir. 2006). Parties may not use "post-decision information as a new rationalization either for sustaining or attacking the Agency's decision." *Ass'n of Pac. Fisheries v. EPA*, 615 F.2d 794, 811–12 (9th Cir. 1980). The four instances where extra-record materials will be considered include:

> (1) if necessary to determine whether the agency has considered all relevant factors and has explained its decision,
> (2) when the agency has relied on documents not in the record, or
> (3) when supplementing the record is necessary to explain technical terms or complex subject matter, [or] ...
> (4) when plaintiffs make a showing of agency bad faith.

*Ctr. for Biological Diversity v. United States Forest Serv*., 100 F.3d 1443, 1450 (9th Cir. 1996) (internal citations omitted).

Here, the Court found certain portions of the Barrows Declaration recited above helpful for explaining the complex subject matter involved in this matter. Additionally, certain information in the Barrow's declaration is necessary to place the administrative decision in context, and will assist the Court in determining whether the agency

considered all relevant factors. However, Barrows's reference to documents not contained in the administrative record before the agency, such as Vargas's food stamp application and housing benefits application, is not admissible because the documents were not considered by the agency in rendering its decision in 2013, and therefore will not be considered by the Court.

Further, USCIS did not rely upon any documents beyond those contained within the administrative record. Other than the provisions of the Barrows Declaration the Court referenced above to explain and understand the various documents contained within the administrative record and the process for creating them, the Court did not consider any other documents attached to the Barrows Declaration, or other speculative testimony, admissible.[15] Vargas's objection to the admission of the Barrows Declaration is overruled in part and sustained in part.

Next, the Government objected to the Court's consideration of Exhibit 1 to Vargas's motion for leave to submit citation to supplemental authority, and requested the Court strike half of page three of the motion. The Court overrules the Government's objection. The Court appreciated Vargas's additional argument and support for the same that 8 C.F.R. § 103.2(b)(17) does not apply to this matter.[16] Further, Exhibit 1 appears to

---

[15] Further, the Court notes the Government did not provide all documents contained in Maria Guadalupe de Vargas's file, citing "confidentiality" restrictions. The Court therefore did not have the benefit of reviewing Maria's I-700 application, and could not verify Barrows's statements about Maria's initial I-700 application. Barrows's statements about the SAW program were necessary to determine whether the Agency considered all relevant factors.

[16] This is especially so because application of 8 C.F.R. § 103.2(b)(17) would have provided additional support for Vargas's argument.

be a memorandum issued by the Department of Homeland Security, a government

agency. Page three of Vargas's motion did nothing more than discuss the holding in

*Mondaca-Vega v. Lynch*, No. 03-71369, slip op. at 11-12 (9th Cir. Dec. 15, 2015). The

Court reviewed the published decision and arrived at its own conclusion as to the

relevance of the *Lynch* decision to the facts of this matter.

### B.    *Relief Under the Administrative Procedure Act*

#### i.    *The SAW Program*

Vargas asserts she became a lawful permanent resident by operation of law under

the Seasonal Agricultural Workers program, 8 U.S.C. § 1160. Section 1160 of the United

States Code, titled "Special Agricultural Workers," provides that the Attorney General

"shall adjust the status of an alien to that of an alien lawfully admitted for temporary

residence if the Attorney General determines that the alien" applied for adjustment of

status during the eighteen month period commencing on June 1, 1987, performed

seasonal agricultural services, and resided in the United States for at least 90 days during

the twelve month period ending on May 1, 1986. 8 U.S.C. § 1160.[17]

According to the USCIS website, the SAW program applied to:

Aliens who performed labor in perishable agricultural commodities for a specified period of time and were admitted for temporary and then permanent residence under a provision of the Immigration Reform and Control Act of 1986. Up to 350,000 aliens who worked at least 90 days in each of the 3 years preceding May 1, 1986 were eligible for Group I temporary resident status. Eligible aliens who qualified under this requirement but applied after the 350,000 limit was met and aliens who performed labor in perishable agricultural commodities for at least 90 days during the year ending May 1, 1986 were eligible for Group II temporary resident status. Adjustment to permanent resident status is essentially automatic for both groups; however, aliens in Group I were eligible on December 1, 1989 and those in Group II were eligible one year later on December 1, 1990.[18]

*See also* 8 U.S.C. § 1160(2) (setting forth the requirement that the Attorney General

"shall" adjust the status of any alien provided lawful temporary resident status under

---

[17] The full text of the statute is as follows:

(a) Lawful residence
(1) In general
The Attorney General shall adjust the status of an alien to that of an alien lawfully admitted for temporary residence if the Attorney General determines that the alien meets the following requirements:
(A) Application period
The alien must apply for such adjustment during the 18-month period beginning on the first day of the seventh month that begins after November 6, 1986.
(B) Performance of seasonal agricultural services and residence in the United States
The alien must establish that he has--
(i) resided in the United States, and
(ii) performed seasonal agricultural services in the United States for at least 90 man-days, during the 12-month period ending on May 1, 1986. For purposes of the previous sentence, performance of seasonal agricultural services in the United States for more than one employer on any one day shall be counted as performance of services for only 1 man-day.

[18] http://www.uscis.gov/tools/glossary/special-agricultural-workers-saw last accessed February 22, 2016, and attached as Appendix 1.

**MEMORANDUM DECISION AND ORDER - 20**

paragraph (1) to that of an alien lawfully admitted for permanent residence for those aliens in Group I or Group II).

Applications under the SAW program were not accepted until June 1, 1987. 8 U.S.C. § 1160(a)(1)(A). The application period ended on November 30, 1988. 8 C.F.R. § 210.1(c). The application consisted of an executed Form I-700, Application for Temporary Resident Status as a Special Agricultural Worker, evidence of qualifying agricultural employment, a report of medical examination, photographs, a finger print card, and payment of the required fee. 8 C.F.R. § 210.1(d); § 210.2(c)(2).[19] Absent a finding of fraud or willful misrepresentation, it appears under the regulations that if the alien met the requirements, she would be issued a Form I-688A, Temporary Resident Card. 8 C.F.R. § 210.1(e), (k), (m); § 210.2(c)(2); § 210.3 (explaining the documents required for proof of eligibility). Provided the applicant met the eligibility requirements, the status of an alien whose application for temporary resident status was approved "shall be adjusted to that of a lawful temporary resident as of the date on which the fee was paid at a legalization office…." 8 C.F.R. § 210.4(a).

"The temporary resident status of a special agricultural worker is terminated automatically" upon entry of a final order of deportation under Section 241 of the Act. 8 C.F.R. § 210.4(d). Alternatively, the status of an alien lawfully admitted for temporary residence "may be terminated before the alien becomes eligible for adjustment of status"

---

[19] The regulations require the applicant, if over the age of 14 years, to appear at an appropriate Service legalization office and be fingerprinted for the purpose of issuance of Form I-688A, and interviewed by an immigration officer. 8 C.F.R. § 210.2(c)(2).

**MEMORANDUM DECISION AND ORDER - 21**

if it is determined that the adjustment to temporary resident status was the result of fraud or willful misrepresentation. 8 C.F.R. § 210.4(d)(2). Otherwise, the status of an alien "lawfully admitted to the United States for temporary residence" under the Act, provided she has maintained such status, "shall be adjusted to that of an alien lawfully admitted to the United States for permanent residence" under either Group 1 or Group 2. 8 C.F.R. § 210.5(a). The alien must appear at a legalization or service office for preparation of Form I-551, Permanent Resident Card. 8 C.F.R. § 210.5(b)(1). The Form I-551, Permanent Resident Card, would be issued after the date of adjustment, provided the alien presented proof of identity, suitable photographs, and a fingerprint and signature on Form I-89. 8 C.F.R. § 210.5(b).

Although an individual's permanent resident status does not expire, the I-551 card issued as proof of permanent resident status expires every 10 years. Accordingly, the lawful permanent resident must file a Form I-90 to renew an expiring I-551 card or to replace a lost or damaged I-551 card. 8 C.F.R. § 264.5(b). Upon application to replace the card, the resident must surrender the prior I-551 card. 8 C.F.R. § 264.5(e)(1). If the request to replace a card is because the applicant's name or other biographic data has changed since the card was issued, the application must include documentary evidence verifying the new data. 8 C.F.R. § 264.5(e)(3).

### ii.     *Non-Discretionary Duty*

Vargas argues the Government had a non-discretionary duty under the SAW program and under 8 U.S.C. § 1304(d)[20] to provide her with a replacement permanent resident card upon the presentation of her expired card, the payment of the proper fee, and the submission of the proper form. Vargas asserts her possession of the Temporary Resident Card, and the Resident Alien Card, consistent with the steps required under the SAW program, are conclusive proof she is entitled to a replacement Permanent Resident Card.

The Government does not disagree that it has a non-discretionary duty under Section 1304(d) to adjust an alien's status under the SAW program to that of a permanent resident, provided the alien filed a Form I-90 to obtain her permanent Resident Alien Card, and in turn initially filed a Form I-700 Application. Defs.' Mem. at 10 (Dkt. 48-1); 8 U.S.C. § 1060(a)(2); 8 C.F.R. § 210.4(a). The Government argues, however, that unless the alien can show from review of official government records that the alien is entitled to the benefit of adjustment of status, the Government is not required to honor the alien's request in the absence of proof that the alien obtained the records through the requisite process. In other words, absent a Form I-700 Application contained within its own records, the Government contends there is no evidence Vargas ever applied for and received temporary resident status, and in turn, permanent resident status, and thus she is not entitled to a replacement card.

---

[20] Section 1304(d) states that "every alien … who has been registered and fingerprinted … under the provisions of this chapter shall be issued a certificate of alien registration …."

Both parties rely upon 8 C.F.R. § 103.2(b)(17), which states:

> The status of an applicant or petitioner who claims that he or she is a permanent resident of the United States or was formerly a permanent resident of the United States will be *verified from official Department records*. These *records include alien and other files*, arrival manifests, arrival records, Department index cards, *Immigrant Identification Cards*, Certificates of Registry, Declarations of Intention issued after July 1, 1929, *Permanent Resident Cards*, or other registration *receipt forms* (provided that such forms were issued or endorsed to show admission for permanent residence), passports, and reentry permits. An official record of a Department index card must bear a designated immigrant visa symbol and must have been prepared by an authorized official of the Department in the course of processing immigrant admissions or adjustments to permanent resident status. *Other cards*, certificates, declarations, permits, and passports *must have been issued or endorsed to show admission* for permanent residence. *Except as otherwise provided in 8 CFR part 101, and in the absence of countervailing evidence, such official records will be regarded as establishing lawful admission for permanent residence*.

(emphasis added.)[21]

Section 103.2(b)(17) creates a burden shifting scheme, as explained in *Berahmand v. INS*, 549 F.2d 1343 (9th Cir. 1977). In *Berahmand*, the court first examined whether the plaintiff had satisfied his initial burden of proving he was granted an adjustment of status to that of a permanent resident, and if he had, whether INS had overcome that

---

[21] The Court questioned the parties at the hearing about the application of 8 C.F.R. § 101.2, which indicates there is a "presumption of lawful admission" if an alien, otherwise admissible whose entry was "made and recorded under other than his full and correct name or whose entry record contains errors in recording," establishes certain criteria by clear, unequivocal and convincing evidence. Vargas explained at the hearing and in her supplemental submission (Dkt. 57) that provision applies only to border admissions at a port of entry.

**MEMORANDUM DECISION AND ORDER - 24**

prima facie showing. In that case, the plaintiff married an American citizen, and his wife filed a visa petition, which was approved. The plaintiff later filed an application for permanent resident status, and an approval stamp appeared on his INS Form I-181, the original record of lawful admission. Some marks, however, were drawn through the approval stamp. Later, the plaintiff's wife, who was divorcing the plaintiff, wrote she wished to withdraw her visa petition. The plaintiff was subject to deportation proceedings on that basis.

The court held the Form I-181 record, on its face, established the creation of permanent resident status, and constituted prima facie evidence that the plaintiff had been granted such status. *Berahamand*, 549 F.2d at 1345. It was then the Government's burden to come forward with evidence that the plaintiff was subject to deportation. *See also Mondaca-Vega v. Lynch*, No. 03-71369 (9th Cir. Dec. 15, 2015) (explaining the government bears the ultimate burden of establishing facts supporting deportability upon presentation by the plaintiff of substantial credible evidence of her citizenship claim).

The court rejected the government's speculative theory that the marks drawn through the approval stamp somehow meant the approval was cancelled. *Berahamand*, 549 F.2d at 1345. Accordingly, the court held the burden shifted to the INS to demonstrate by "clear, convincing and unequivocal evidence that petitioner was deportable." *Id.* The government argued there was a memorandum in the plaintiff's file showing an investigation had ensued, and thus, the adjustment had not been granted. The court disagreed, concluding the memorandum was less than clear, and involved a "bounced" check. *Id.* Ultimately, the court concluded the government's evidence was

mere speculation, which was not a substitute for clear, convincing, and unequivocal evidence. *Id.* The court remanded the matter to INS for further proceedings.

Thus, the statutory scheme both parties rely upon requires Vargas to come forward with official records establishing lawful admission for permanent resident status. Upon doing so, the Government must set forth countervailing evidence. Countervailing evidence means something more than the drawing of inferences. For example, in *Krasilych v. Holder*, 583 F.3d 962 (7th Cir. 2009), the plaintiff contended that an I-551 stamp on his passport, which he obtained upon visiting a storefront in Chicago and paying a fee, constituted proof he had been approved for permanent resident status and was awaiting his permanent resident card. Apparently, the plaintiff was ensnared in an elaborate undercover sting operation. The government had been investigating storefronts like the one the plaintiff visited, which were staffed with corrupt immigration employees who could be paid to supply genuine documentation, and whom aliens found with the help of crooked middlemen.

Although the I-551 stamp was real and authentic, the immigration judge concluded the plaintiff was not lawfully present in the United States, and the stamp did not confer lawful permanent resident status upon someone who was not eligible for that status. *Krasilych*, 583 F.3d at 966. The court upheld the determination of the agency, explaining that, "[w]hen used legitimately, the stamp is a symbol that immigration authorities have favorably adjudicated an application to adjust status, and in the absence of 'countervailing evidence' the stamp itself can be used to verify a claim of permanent residence." *Krasilych*, 583 F.3d at 967. But, the plaintiff's application was never

**MEMORANDUM DECISION AND ORDER - 26**

adjudicated and would have been denied had it been reviewed, and the "countervailing evidence" of the sting operation being conducted at that time rendered the stamp meaningless. *Id*. at 967.

      **iii.**        ***Analysis***

Vargas's uncontroverted facts constitute substantial credible evidence she attained temporary resident status under the SAW program. Her uncontroverted testimony establishes she picked fruit in Sanger, California, upon her arrival in the United States in 1983. Next, someone from her employer "gave her papers" in "1985 or 1986," which is around the time the SAW program came into existence, to apply for temporary resident status. Consistent with the SAW program guidelines, she visited an immigration office in person in Fresno, California, completed a yellow form, and thereafter received a Temporary Resident Card issued in the name of Maria Rosalva Vargas, birthdate February 3, 1965, with an issuance date of June 3, 1988, under Alien Number A090-422-457. The card bore Vargas's photograph, fingerprint, and her signature, "M$^a$ Rosalba," but the birthdate was wrong, Rosalba was spelled wrong, and the first name Maria appeared on the card.

The timing of Vargas's receipt of her temporary resident card coincides directly with the dates of the SAW program as outlined in 8 U.S.C. § 1160 and the implementing regulations. Vargas's receipt of a temporary resident card bearing her photograph and fingerprint constitutes proof that her application for temporary resident status was approved under the SAW program. There is no evidence that the 1988 card was fake or procured by fraud, like the stamp was in *Krasilych*.

The Government contends its countervailing evidence establishes Vargas did not submit an application because there is no I-700 application pertaining to Vargas in its official records; the application form for the SAW program was green, not yellow; and Vargas thought she applied in 1985 or 1986, not in 1987, when the SAW program first accepted applications. The Government contends also that Vargas's use of the name "Maria," and the incorrect birthdate on the 1988 card, indicates Vargas perpetuated fraud.

However, the Court must construe the facts in favor of the non-moving party for purposes of the Government's motion, and the inferences the Government asks this Court to make in its favor are based upon mere speculation. All of Vargas's actions, and the receipt of an authentic Temporary Resident Card, are consistent with the timing of the SAW program. The Government cannot point to any other program that existed in the late 1980's that Vargas might have applied for using a yellowish form in 1985 or 1986.[22] In other words, there is no evidence that some other program existed such that Vargas was mistaken about the SAW program. Rather, what she remembers now, twenty-five years later, appears slightly off. The rational and logical inference is that Vargas applied under the SAW program, because the inference is consistent with Varga's testimony that she arrived in the United States, picked fruit in Sanger, California, and was issued an

---

[22] June 1, 1987, was the first date applications were accepted under the SAW program. Thus, it appears feasible that Vargas could have completed the application form in late 1986 or early 1987, after SAW was enacted on November 6, 1986. Nov. 6, 1986, Pub.L. 99-603, Title III, § 302(a)(1), 100 Stat. 3417. Additionally, according to the legislative history, applications were to be made to the Attorney General, or the Attorney General could designate qualified voluntary organizations and other qualified State, local, community, farm labor organizations, and associations of agricultural employers, to receive applications.

**MEMORANDUM DECISION AND ORDER - 28**

official Temporary Resident Card on June 3, 1988, that could only have been attained by applying under the SAW program.

Moreover, the card issued to Vargas in 1988 unequivocally relates to Vargas, despite the incorrect date of birth and the addition of the first name Maria. There is no evidence that Vargas had knowledge of anyone named Maria in Florida at that time. Maria Guadalupe de Vargas's name was not on Vargas's first card. Rather, the name "Rosalva Vargas" is on Vargas's card. There is no indication Vargas committed fraud in 1988, because the Government has not explained why Vargas had a motive to lie. There was no benefit to Vargas in 1987 or 1988 from the use of the name Maria, or the incorrect birthdate, to procure the temporary resident card.

To obtain the card, Vargas visited an immigration office in person in Fresno, and risked deportation if she did not meet the eligibility requirements under the SAW program. Officials in Fresno, California, possessed Vargas's photograph and fingerprints, and affixed them to the card. If government officials were confused about who Vargas was, Maria Guadalupe de Vargas's file, photograph, fingerprints, and I-700 application were on file in Miami, Florida, as of June 3, 1987, three days after the Government began accepting applications. And finally, perpetuation of a fraud is inconsistent with Vargas signing the card "Mᵃ Rosalba Vargas."[23]

The second card issued to Vargas required her to visit the Boise immigration office in person prior to June 3, 1992, submit form I-90, pay a fee, and surrender her

---

[23] The misspelling of "Rosalba" on the Temporary Resident Card issued in 1988 lends credence to the inference that an immigration official made a mistake.

Temporary Resident Card. The Government offers no explanation why Vargas, if she was here unlawfully, would risk deportation by appearing in person at an immigration field office and completing a form to replace her temporary resident card.

And, interestingly, the Administrative Record contains a receipt for a money order in the name of Rosalba Vargas. Dated July 30, 1992, Form I-797, the notice of receipt form for the I-90 application, indicates the I-90 Application to Replace Alien Registration Card was received, as was the $70 fee, and that the Alien number was A90422-457. But, Vargas's file does not contain a copy of the I-90 application Vargas contends she submitted.[24] The Government has no explanation why Form I-90 is missing from Vargas's new A-file the Government created in 2009, or why the Government mailed a new card to Vargas in Grand View, Idaho, addressed to Maria Guadalupe de Vargas, when the Government knew or should have known that Maria Guadalupe de Vargas lived in Miami, Florida.

Because of that oversight, Vargas's card arrived with her photograph and fingerprint, but it then displayed the name Maria Guadalupe de Vargas with the date of birth February 3, 1965. Vargas again signed the card with her name, "Mª Rosalba Vargas." At that time, there was only one A-file number, pertaining to two different

---

[24] The Government's statement of undisputed material facts confirms, at paragraph 6, that the Government does not possess anything other than the I-90 receipt notice, and the Customer's Receipt it apparently issued to Vargas. (Dkt. 47-2 at 3, ¶ 6.) However, the Government admits it has a copy of Vargas's I-90 application she submitted in 2008, in the name of Rosalba Vargas Ortiz. (Dkt. 47-2 at 3 ¶ 10.) Apparently, the Government misplaced not just the I-700 application, but also the 1992 I-90 application Vargas would have had to have submitted to generate a receipt and obtain a replacement permanent resident card.

**MEMORANDUM DECISION AND ORDER - 30**

people, living on opposite sides of the country, yet the Government apparently failed to notice.

The Government contends the next piece of countervailing evidence that Vargas is not entitled to adjustment of status is her continued use of a card that did not bear her correct name. However, there is no evidence that Vargas procured the replacement LPR card by fraud, and the Government's own record indicates Vargas submitted Form I-90 (which is missing from the file), yet the Government issued a receipt in the wrong name. It defies logic that Vargas obtained the name Maria Guadalupe de Vargas, a woman she had never met nor heard of, and submitted her I-90 application with that name when the first, indisputably genuine card she received and was required to surrender bore the name Maria Rosalva Vargas. The only way Vargas could have obtained the replacement LPR card bearing the incorrect name was from the Government itself. The Government therefore has no countervailing evidence to rebut Vargas's substantial evidence of her lawful permanent resident status. The Government's decision, therefore, to deny Vargas's claim to permanent resident status is not reasonable, and not supported by countervailing evidence in the record.

The Government argues it is simply preposterous that the INS and immigration officials perpetuated a mistake for over twenty-five years, because it is not plausible that government officials would have thought the errors in both Vargas's name and date of birth on official paperwork were of no consequence. The Government contends that a resident card bearing inaccurate identifying information would have raised significant

**MEMORANDUM DECISION AND ORDER - 31**

concern and required correction, and thus, Vargas's story "requires the convergence of multiple highly unlikely coincidences of official malfeasance."

The Court has highlighted the multiple coincidences of official malfeasance in the Government's own record, which is missing Vargas's 1992 I-90 application and her I-700 application. The Government cannot explain why it issued Vargas a Temporary Resident Card in 1988, which could not have been issued absent an application and submission of a photograph, fingerprints, fee, and other documentation under the SAW program. Likewise, a receipt for the 1992 I-90 application could not have been generated absent an application. The receipt is issued in a name that does not match the name on the Customer's Receipt Vargas obtained upon paying the $70 fee. Further, the designation "MIA" for "Miami" appears on Vargas's LPR Card, yet the card was mailed to an Idaho address. At the time, Maria Guadalupe Bueno de Vargas had her photograph and fingerprints in the USCIS system under the same Alien number used by Vargas and was living in Miami, Florida. Nor can the Government explain how Vargas's photograph and fingerprint each found their way onto official, authentic cards in Vargas's possession. Given these facts, the Court finds it plausible that "multiple highly unlikely coincidences of official malfeasance" could have occurred, and likely did occur.

Here, the Government has not offered anything other than speculation based upon Vargas's testimony that she received paperwork in 1985 or 1986, before the SAW program began accepting applications, and the fact she stated the form was yellow, not green, to imply Vargas never submitted an I-700 application under the SAW program. But Vargas's 1988 Temporary Card constitutes prima facie evidence that she was granted

**MEMORANDUM DECISION AND ORDER - 32**

temporary resident status. *Berahamand*, 549 F.2d at 1345. Unlike *Krasilych*, Vargas's temporary resident card is authentic, there was no sting operation, and the Government has not provided evidence the card was procured by fraud.

Vargas's testimony of having visited the immigration office in person to obtain the card is consistent with SAW program regulations. And, her testimony about having arrived in California to pick fruit is similarly consistent with the SAW program requirements. As in *Berahmand*, the Government offers nothing more than speculation based solely upon Vargas's testimony she completed a yellow form in 1985 or 1986, before the application period commenced in 1987, that she never did apply for residency under the SAW program. Finally, unlike *Krasilych*, the Government has not shown that Vargas, if she had filled out an I-700 form, would not have otherwise been "lawfully admitted" pursuant to SAW.

The Government seeks to interpret the phrase, "lawfully admitted for permanent resident status," as one who completes the proper paperwork, which the Government can verify in its files. However, the Government reads the phrase too narrowly, and overlooks that other documents may be used to verify an alien's status under 8 C.F.R. § 103.2(b)(17). The Court of Appeals for the Second Circuit in *De La Rosa v. U.S. Dept. of Homeland Security*, 489 F.3d 551, 554 (2nd 2007), explained that the term "lawfully admitted for permanent residence" means "more than just procedural regularity; it suggests that the substance of an action complied with the governing law." In other words, the alien must have "complied with the substantive legal requirements in place at the time she was admitted for permanent residence." *Id.* at 555; *see also Gallimore v.*

*Attorney General of U.S.*, 619 F.3d 216, 224 (3rd Cir. 2010) (requiring compliance with the substantive legal requirements in place at the time of admittance for permanent residence).

In *De La Rosa*, plaintiff's application depended upon establishing her date of entry into the United States. Under the amnesty provision under which she claimed permanent resident status, she must have entered prior to January 1, 1982, and resided continuously in the United States after that time. De La Rosa's testimony that she entered the United States in 1980 in Puerto Rico was found unpersuasive in light of her tourist visa, which noted she had entered the United States in 1987. Accordingly, the court affirmed the agency's finding that De La Rosa had not complied with the substantive legal requirements (entry prior to 1982), and therefore was never lawfully admitted.

Here, in contrast, Vargas submitted official Department records consisting of her identification cards, which bore her fingerprint and photograph, and which could not have been issued to her absent approval of an initial application. 8 C.F.R. § 102.3(b)(17) allows consideration of all such records as proof of permanent resident status. In other words, the absence of an I-700 Application is not conclusive on this record. Although Vargas may have had her dates slightly off and incorrectly recalled the form was yellow, her testimony is consistent with someone who applied under the SAW program. The only evidence the Government can point to that Vargas is not eligible for admission is the absence of an I-700 form filled out and submitted by Vargas on or after June 1, 1987. However, the Government has not conclusively established that Vargas, based upon her testimony that she arrived in the United States and worked as a fruit picker in the late

1980's, did not otherwise fulfill the substantive requirements of the SAW program. Her temporary resident card constitutes proof of her application and status under that program.

The Government argues its mistake should not be perpetuated by granting Vargas permanent resident status, relying upon the line of cases concluding that, where an alien obtains lawful permanent resident status through administrative oversight, despite being ineligible for that status, the alien has not been "lawfully admitted for permanent residence." *Reyes v. Mayorkas*, 65 F.Supp.3d 413, 416 (E.D. Penn. 2014). However, in the cases cited by the Government involving administrative oversight, the facts established that government officials failed to conduct a thorough background check, which would have revealed the alien was not entitled to adjustment of status because the alien did not fulfill the substantive legal requirements for that status.

For example, in *Reyes*, the plaintiff illegally entered the United States and a deportation order was issued. The plaintiff claimed he did not know the deportation order existed. The plaintiff later married an American citizen, and remained in the United States until a later voluntary departure. Upon his return to the United States, he applied for lawful permanent resident status based upon marriage, and he did not disclose the prior deportation order because he did not know about it. His LPR status was granted, and the plaintiff later sought to become a naturalized citizen. An alien is eligible for naturalization following lawful admission as a permanent resident.

The Pennsylvania court held that the prior deportation order excluded the plaintiff from ever having been lawfully admitted as a permanent resident, despite the

government's mistake in overlooking the order when it granted him LPR status. *Reyes*, 65 F.Supp.3d at 417. Accordingly, the court found him ineligible for naturalization, because the plaintiff could not show he was legally entitled to LPR status. *Id. See also Gallimore v. Attorney General of U.S.*, 619 F.3d 216, 224 (3rd Cir. 2010) ("Where an alien obtains LPR status through administrative oversight—despite being ineligible for that status for one reason or another—several…courts…have deferred to BIA decisions concluding that the alien has not been 'lawfully admitted for permanent residence.'").

In contrast here, the Government cannot show and has not shown Vargas was not otherwise entitled to LPR status. Nothing controverts Vargas's testimony she was eligible under the SAW program, and the only administrative oversight is the lack of retention of Vargas's I-700 application form by the Government. Yet, the issuance of the Temporary Resident Card in 1988 indicates she applied during the application period for the SAW program, and her testimony satisfies the finding that she performed seasonal agricultural services in the United States for 90 days during the twelve month period ending May 1, 1986. *See* 8 U.S.C. § 1160(a)(1)(A), (B). Vargas otherwise fulfills the substantive requirements under the SAW program, and there is no administrative oversight of the nature discussed in *Reyes* which would render her ineligible for adjustment of status.

The Court is left with the firm conviction that the evidence in the record did not permit the Government to make the determination it did in 2013, when it denied Vargas's I-90 Application to Replace Permanent Resident Card. Based upon the above, the evidence before the agency indicates its officials ignored the significance of its own official records, namely the issuance of and possession by Vargas of the 1988 Temporary

Resident Card, and myopically considered the absence of the I-700 application to be conclusive when the facts otherwise indicated Vargas was qualified for lawful admission under the SAW program. The Government also utterly failed to consider an important aspect of the issue, which is that Vargas, a twenty-three year old non-English speaking immigrant at the time she qualified for lawful admission under the SAW program, who had arrived here on foot at the age of eighteen, had no motive to commit fraud and could not have known Maria Guadalupe de Vargas, living in Miami, Florida, had the same Alien number as was assigned to Vargas. Only the Government knew that. Vargas is now being penalized for using authentic documents provided to her by the Government upon her application,[25] which the Government does not contend were procured by fraud.[26]

The Court finds the agency action should be set aside as arbitrary and capricious, and this matter should be remanded for further proceedings consistent with this memorandum decision. The statute applicable to the SAW program affirmatively requires the Attorney General to adjust the status of an alien to that of an alien lawfully admitted for temporary residence if the alien applied for such status during the application period, and fulfilled the seasonal agricultural work requirement. If those two requirements are satisfied, adjustment to permanent resident status is automatic and nondiscretionary. Here, the substantial evidence in the record, considered as a whole, indicates Vargas is

---

[25] This matter presents the classic conundrum. Vargas could only have been given a Temporary Resident Card in 1988 upon filing an application. Yet, the Government lacks the application, finding that fact conclusive. The logic is flawed because the card could not have been obtained without an application, thereby rendering the lack of one in Vargas's file insignificant in light of the record as a whole.

[26] Importantly, the Government contends the continued use of a card it gave to Vargas with the incorrect name and date of birth constitutes fraud, not the procurement of the document itself.

entitled to adjustment of status to that of a lawful permanent resident under 8 U.S.C. § 1160.

Because the Court finds for Vargas under the APA, the Court considers Vargas's alternative claim under the Mandamus Act to be duplicative. *See Sharkey v. Quarantillo*, 541 F.3d 75, 93 (2nd Cir. 2008) (finding claim for mandamus duplicated plaintiff's claims under the APA and affirming dismissal of the mandamus claim on the grounds there was another adequate remedy available). The Court also needs not consider Vargas's additional argument that she was entitled to rescission proceedings before the Government terminated Vargas's LPR status.

## CONCLUSION

For the reasons discussed above, Defendants' motion for summary judgment will be denied and Plaintiff's motion for summary judgment will be granted. Plaintiff is entitled to judgment on her claim for declaratory judgment under the Administrative Procedures Act. UCIS's decision denying Plaintiff's I-90 Application is reversed, and the matter is appropriately remanded to the Agency for further proceedings, namely processing the Plaintiff's Form I-90 in accordance with this Order. *See Medina v. Beers*, 65 F.Supp.3d 419 (E.D. Penn. 2014) (granting plaintiff's motion for summary judgment under the APA and remanding to USCIS).

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)    Plaintiff's Motion for Summary Judgment (Dkt. 46) is **GRANTED**.

2)    Defendants' Motion for Summary Judgment (Dkt. 48) is **DENIED**.

3)    This case shall be **REMANDED** to the United States Citizenship and

Immigration Service for further proceedings consistent with this

Memorandum Decision and Order.

Dated: **February 22, 2016**

Honorable Candy W. Dale
United States Magistrate Judge